1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ANTHONY AMMONS,

11          Plaintiff,                    No. CIV S-10-0544 KJM DAD P

12      vs.

13   C. BAKEWELL et al.,              ORDER AND

14          Defendants.               FINDINGS AND RECOMMENDATIONS

15   _____/

16          Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17   relief under 42 U.S.C. § 1983.  This matter is before the court on a motion for summary

18   judgment brought on behalf of defendant Bakewell pursuant to Rule 56 of the Federal Rules of

19   Civil Procedure.  Plaintiff has filed an opposition to the motion, and defendant has filed a reply.

20                              **BACKGROUND**

21          Plaintiff is proceeding on his original complaint against Nurse Practitioner

22   Bakewell.  Therein, he alleges as follows.  On June 10, 2009, plaintiff was injured on the

23   basketball court after being poked in his left eye.  His fellow inmates escorted him to the medical

24   clinic where he experienced a one hour and fifteen-minute delay in receiving medical care.

25   Plaintiff overheard another nurse inform defendant Nurse Practitioner Bakewell about the

26   severity of plaintiff's injury, but defendant Bakewell merely instructed that nurse to give plaintiff

1

1  eye drops and to send him back to his cell without an examination.  That same evening plaintiff

2  experienced pain, dizziness, and constant headaches, and he could not see out of his left eye.

3  Plaintiff then returned to the medical clinic at which point medical personnel referred him to the

4  U.C. Davis Medical Center.  Plaintiff was diagnosed with a corneal abrasion.  Plaintiff claims

5  that in this way defendant Bakewell was deliberately indifferent to his medical needs in violation

6  of the Eighth Amendment.  In terms of relief, plaintiff seeks monetary damages.  (Compl. at 1-10

7  & Exs.)

8  **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

9  Summary judgment is appropriate when it is demonstrated that there exists "no

10  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

11  matter of law."  Fed. R. Civ. P. 56(c).

12  Under summary judgment practice, the moving party
   always bears the initial responsibility of informing the district court
13  of the basis for its motion, and identifying those portions of "the
   pleadings, depositions, answers to interrogatories, and admissions
14  on file, together with the affidavits, if any," which it believes
   demonstrate the absence of a genuine issue of material fact.

15

16  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

17  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

18  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

19  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

20  after adequate time for discovery and upon motion, against a party who fails to make a showing

21  sufficient to establish the existence of an element essential to that party's case, and on which that

22  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

23  concerning an essential element of the nonmoving party's case necessarily renders all other facts

24  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

25  whatever is before the district court demonstrates that the standard for entry of summary

26  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

2

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

1  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

2  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

3  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

4  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

5  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

7                    **OTHER APPLICABLE LEGAL STANDARDS**

8  I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

9            The Civil Rights Act under which this action was filed provides as follows:

10           Every person who, under color of [state law] . . . subjects, or causes
             to be subjected, any citizen of the United States . . . to the
11           deprivation of any rights, privileges, or immunities secured by the
             Constitution . . . shall be liable to the party injured in an action at
12           law, suit in equity, or other proper proceeding for redress.

13  42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the

14  actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See

15  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

16  (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the

17  meaning of  § 1983, if he does an affirmative act, participates in another's affirmative acts or

18  omits to perform an act which he is legally required to do that causes the deprivation of which

19  complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

20           Moreover, supervisory personnel are generally not liable under § 1983 for the

21  actions of their employees under a theory of respondeat superior and, therefore, when a named

22  defendant holds a supervisorial position, the causal link between him and the claimed

23  constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

24  (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

25  allegations concerning the involvement of official personnel in civil rights violations are not

26  sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

II.  The Eighth Amendment and Inadequate Medical Care

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

Where a prisoner's Eighth Amendment claims arise in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical need include "the presence of a medical condition that significantly affects an individual's daily activities."  Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in

5

1   which prison officials provide medical care.  <u>Hutchinson v. United States</u>, 838 F.2d 390, 393-94

2   (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard

3   to medical care, however, "the indifference to his medical needs must be substantial.  Mere

4   'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

5   <u>Broughton v. Cutter Laboratories</u>, 622 F.2d 458, 460 (9th Cir. 1980) (citing <u>Estelle</u>, 429 U.S. at

6   105-06).  <u>See also</u> <u>Toguchi v. Soon Hwang Chung</u>, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

7   negligence in diagnosing or treating a medical condition, without more, does not violate a

8   prisoner's Eighth Amendment rights."); <u>McGuckin</u>, 974 F.2d at 1059 (same).  Deliberate

9   indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

10   ordinary lack of due care for the prisoner's interests or safety.'"  <u>Farmer</u>, 511 U.S. at 835

11   (quoting <u>Whitley</u>, 475 U.S. at 319).

12          Delays in providing medical care may manifest deliberate indifference.  <u>Estelle</u>,

13   429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

14   providing care, a plaintiff must show that the delay was harmful.  <u>See</u> <u>Berry v. Bunnell</u>, 39 F.3d

15   1056, 1057 (9th Cir. 1994); <u>McGuckin</u>, 974 F.2d at 1059; <u>Wood v. Housewright</u>, 900 F.2d 1332,

16   1335 (9th Cir. 1990); <u>Hunt v. Dental Dep't</u>, 865 F.2d 198, 200 (9th Cir. 1989); <u>Shapley v.</u>

17   <u>Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a]

18   prisoner need not show his harm was substantial; however, such would provide additional

19   support for the inmate's claim that the defendant was deliberately indifferent to his needs."  <u>Jett</u>

20   <u>v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006).  <u>See also</u> <u>McGuckin</u>, 974 F.2d at 1060.

21          Finally, mere differences of opinion between a prisoner and prison medical staff

22   or between medical professionals as to the proper course of treatment for a medical condition do

23   not give rise to a § 1983 claim.  <u>Toguchi</u>, 391 F.3d at 1058; <u>Jackson v. McIntosh</u>, 90 F.3d 330,

24   332 (9th Cir. 1996); <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989); <u>Franklin v. Oregon</u>, 662

25   F.2d 1337, 1344 (9th Cir. 1981).

26   /////

**DEFENDANT BAKEWELL'S MOTION FOR SUMMARY JUDGMENT**

I. <u>Defendant Bakewell's Statement of Undisputed Facts and Evidence</u>

Defendant Bakewell's statement of undisputed facts is supported by citations to her own declaration signed under penalty of perjury.  It is also supported by citations to plaintiff's medical records, deposition transcript, complaint, as well as his answers to interrogatories posed by defendant.

The evidence submitted by defendant Bakewell establishes the following.  At all relevant times, defendant Bakewell was a nurse practitioner at California State Prison, Sacramento.  On June 10, 2009, she was working at the "B" facility medical clinic from 10:00 a.m. to 2:00 p.m.  Defendant Bakewell's custom and habit is to examine any inmate with an eye injury under an ultraviolet lamp to see if the eye is scratched or injured.  Depending on the condition of an eye, she either gives the inmate eye drops or refers him to the doctor.  Defendant Bakewell does not recall seeing plaintiff on June 10, 2009, and does not recall being notified of an inmate with an eye injury on that date.  She also does not recall instructing a nurse to give plaintiff eye drops and to send him back to his cell.  (Def.'s SUDF 2 & 9, Bakewell Decl.)

Plaintiff claims that on June 10, 2009, between 10:00 a.m. and 11:00 a.m. he was poked in the left eye during a basketball game.  He walked to the medical clinic and waited to be seen for about an hour and fifteen minutes.  He claims that during that time he overheard an unidentified nurse (hereinafter "Nurse Doe") tell defendant Bakewell that there was an inmate with an eye injury in the clinic.  According to plaintiff, defendant Bakewell told Nurse Doe to give him eye drops and send him back to his cell.  Plaintiff did not actually see defendant Nurse Practitioner Bakewell make this statement but claims that he recognized her voice.  (Def.'s SUDF 3-8, Bakewell Decl., Pl.'s Dep. & Compl.)

Plaintiff asserts that Nurse Doe came out to the waiting area, gave him the eye drops, and told him to go back to his cell.  Plaintiff uttered some profanities, "basically called people the B word and stuff and walked out."  Plaintiff did not ask if he could continue to wait to

see a doctor and did not ask to speak to defendant Bakewell.  Instead, he left after taking the eye

drops without asking any questions.  Plaintiff did not request any pain medication, and there is no

indication that he told anyone that he was experiencing pain before leaving the clinic.  He went

back to his cell between 11:30 a.m. and 12:00 p.m. and applied the eye drops at 12:30 p.m.  He

also took some Motrin that he obtained from a fellow inmate and then slept for three or four

hours.  At 4:00 p.m., he used the eye drops again.  At about 5:00 p.m., after eating dinner,

plaintiff was getting ready to head outside to water the grass.  When he stood up, he felt dizzy

and had a bad headache.  He decided to return to the medical clinic to talk to the nurses to see if

something was wrong.  (Def.'s SUDF 10-20, Pl.'s Dep.)

Plaintiff arrived back at the medical clinic at about 5:45 p.m.  At that time another

nurse looked at his left eye and called Dr. Duc because plaintiff's left pupil was dilated.  Dr. Duc

requested that plaintiff be sent to the U.C. Davis Medical Center emergency room.  According to

medical records, plaintiff was admitted to the U.C. Davis emergency room at 9:38 p.m.  He was

given Vicodin for pain and was told to wait to see an eye specialist.  At about 4:00 a.m. the

following day, plaintiff saw Dr. Stuber.  She diagnosed plaintiff as suffering from a corneal

abrasion, applied an eye patch, and provided him with eye drops.  At 7:00 a.m., plaintiff was

discharged.  Dr. Stuber removed the eye patch, told plaintiff to follow up with the U.C. Davis

Eye Center in two weeks, and indicated that an ophthalmology exam of the cornea showed

"[a]brasion resolved."  (Def.'s SUDF 21-28, Pl.'s Dep., CDCR Med. Records, U.C. Davis Med.

Records.)

In June and July 2009, plaintiff claims that he temporarily lost vision in his left

eye on three occasions.  Plaintiff was seen at California State Prison, Sacramento on June 13,

2009, June 14, 2009, June 17, 2009, and July 3, 2009.  He also had follow-up visits with U.C.

Davis on June 30, 2009, July 3, 2009, July 14, 2009, August 7, 2009, and August 14, 2009.  At

some point between June 11, 2009, and June 30, 2009, plaintiff was diagnosed with traumatic

iritis.  On August 14, 2009, Dr. Krispel at U.C. Davis noted that plaintiff's "traumatic iritis is

1  resolved and his visual acuity is back to baseline."  (Def.'s SUDF 29-33, Pl.'s Dep., CDCR Med.

2  Records.)

3          Plaintiff admits that he suffered headaches and migraines prior to being poked in

4  the eye but claims that they occur more consistently now.  No doctor has ever indicated to

5  plaintiff that the symptoms of iritis could have been prevented if he had been treated sooner.  Nor

6  has any doctor ever told plaintiff that the increase in the frequency of his headaches was caused

7  by any delay in treating his eye on June 10, 2009.  (Def.'s SUDF 34-35, Pl.'s Dep., CDCR Med.

8  Records.)

9  II. <u>Defendant Bakewell's Arguments</u>

10          Defense counsel argues that defendant Bakewell is entitled to summary judgment

11  in her favor on plaintiff's Eighth Amendment claims because there is no evidence before the

12  court indicating that the defendant was deliberately indifferent to plaintiff's medical needs.

13  Specifically, defense counsel contends that, even if defendant Bakewell told Nurse Doe to give

14  plaintiff eye drops and send him back to his cell, her conduct does not rise to the level of

15  deliberate indifference because she did not purposefully ignore or fail to respond to plaintiff's

16  medical needs.  (Def.'s Mem. of P. & A. at 6.)

17          In addition, defense counsel notes that although plaintiff claims that he heard

18  defendant Bakewell give instructions to Nurse Doe, he never asked to speak with defendant

19  Bakewell.  Instead, when Nurse Doe provided him with the eye drops, he started cursing and

20  exited the medical clinic.  Defense counsel observes that plaintiff admits that he did not ask

21  Nurse Doe why he was being sent back to his cell and did not request to keep waiting to see the

22  doctor but instead voluntarily left the clinic.  (Def.'s Mem. of P. & A. at 6.)

23          Counsel also contends that the evidence before the court establishes that

24  defendant Bakewell did not delay plaintiff's medical treatment.  Rather, plaintiff did not return to

25  the clinic for six hours even though nothing prevented him from seeking additional medical care

26  during this time.  Instead, defense counsel notes, plaintiff admits that he slept for three or four

1   hours after taking Motrin, ate dinner and was preparing to go to work that evening.  Defense

2   counsel contends that these activities are inconsistent with someone allegedly suffering from the

3   "unnecessary and wanton infliction of pain."  In any event, counsel argues that plaintiff has not

4   established that any delay in his treatment caused him further harm.  According to defense

5   counsel, plaintiff's corneal abrasion and traumatic iritis were caused by the poke in the eye, not

6   by any delay in treatment, and both conditions resolved fully without any permanent damage.

7   (Def.'s Mem. of P. & A. at 6-7.)

8           Finally, defense counsel contends that any disagreement with the medical

9   instructions that defendant Bakewell allegedly gave to Nurse Doe is not evidence of deliberate

10   indifference.  Defense counsel argues that plaintiff's own opinion that defendant Bakewell

11   should have somehow responded differently after being informed that plaintiff had been poked in

12   the eye, does not create a triable issue of material fact since plaintiff has no medical training or

13   expertise upon which to base his opinion regarding the appropriate medical care under these

14   circumstances.  (Def.'s Mem. of P. & A. at 7.)

15   III.  Plaintiff's Opposition

16           Plaintiff's opposition to defendant's motion for summary judgment is supported

17   by his own declaration signed under penalty of perjury and by copies of his medical records.

18   Plaintiff has also submitted a response to defendant Bakewell's statement of undisputed facts.

19           Plaintiff argues that there are genuine issues of disputed material fact in this case

20   precluding summary judgment.  In particular, plaintiff believes there are factual disputes about

21   whether defendant Bakewell responded to plaintiff's serious medical needs; whether and for how

22   long defendant Bakewell delayed plaintiff's medical treatment; whether plaintiff arrived at the

23   clinic in significant pain requiring obvious treatment; and whether defendant Blackwell could

24   appropriately conclude that plaintiff only needed eye drops without examining his eye.  (Pl.'s

25   Mem. of P. & A. at 1-12.)

26   /////

IV.  Defendant Bakewell's Reply

In reply, defense counsel argues that plaintiff disputes many of defendant's statement of undisputed facts based merely on semantics.  Defense counsel contends that plaintiff has not submitted any evidence in opposition to the motion for summary judgment establishing that defendant Bakewell was deliberately indifferent to his serious medical needs.  (Def.'s Reply at 4-10.)

## ANALYSIS

I.  Plaintiff's Serious Medical Needs

The undersigned concludes that based upon the evidence presented by the parties in connection with the pending motion a reasonable juror could conclude that plaintiff's eye injury constitutes an objective, serious medical need.  See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical conditions that may result in pain and suffering which serve no legitimate penological purpose.").  Specifically, plaintiff's medical history demonstrates that a failure to treat him could result in "further significant injury" and the "unnecessary and wanton infliction of pain." McGuckin, 974 F.2d at 1059.

Accordingly, defendant Bakewell's motion for summary judgment hinges on whether, based upon the evidence before the court on summary judgment, a rationale jury could conclude that the defendant responded to plaintiff's serious medical needs with deliberate indifference.  See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

/////

/////

II.  Defendant Bakewell's Response to Plaintiff's Serious Medical Needs

The court finds that defendant Bakewell has borne her initial responsibility of demonstrating that there is no genuine issue of material fact with respect to the adequacy of the medical care provided to plaintiff.  Specifically, defendant's evidence demonstrates that at all relevant times, she was a nurse practitioner at California State Prison, Sacramento.  On June 10, 2009, she was working at the "B" facility medical clinic from 10:00 a.m. to 2:00 p.m.  Her custom and habit is to examine any inmate who presents with an eye injury under an ultraviolet lamp to see if the eye is scratched or injured.  Depending on the condition of an eye, she either gives the inmate eye drops or refers him to the doctor.  Defendant Bakewell does not recall seeing plaintiff on June 10, 2009, and does not recall being notified of an inmate at the clinic that day with an eye injury.  She also does not recall instructing a nurse to give plaintiff eye drops and to send him back to his cell.  (Bakewell Decl.)

Plaintiff claims that on June 10, 2009, between 10:00 a.m. and 11:00 a.m. he was poked in the left eye during a basketball game.  He walked to the medical clinic and waited for about an hour and fifteen minutes to be seen.  During that time, plaintiff claims that he overheard Nurse Doe tell defendant Bakewell that there was an inmate in the clinic with an eye injury.  According to plaintiff, defendant Bakewell told Nurse Doe to give him eye drops and send him back to his cell.  Plaintiff did not actually see defendant Bakewell but claims that he recognized her voice.  (Bakewell Decl., Pl.'s Dep. & Compl.)

Plaintiff claims that Nurse Doe came out to the waiting area, gave him the eye drops, and told him to go back to his cell.  Plaintiff uttered some profanities, "basically called people the B word and stuff and walked out."  Plaintiff did not ask if he could continue to wait to see a doctor and did not ask to speak to defendant Bakewell.  Instead, he left after taking the eye drops without asking any questions.  Plaintiff did not request any pain medication, and there is no indication that he told anyone that he was experiencing pain before leaving the clinic.  He went back to his cell between 11:30 a.m. and 12:00 p.m. and applied the eye drops at 12:30 p.m.  He

also took some Motrin that he obtained from a fellow inmate and then slept for three or four hours.  At 4:00 p.m., he used the eye drops again.  At about 5:00 p.m., after eating dinner, plaintiff was getting ready to head outside to water the grass.  When he stood up, he felt dizzy and had a bad headache.  He decided to return to the medical clinic to talk to the nurses to see if something was wrong.  (Pl.'s Dep.)

Plaintiff arrived back at the medical clinic at about 5:45 p.m. on June 10, 2009.  Another nurse looked at his left eye, saw that it was dilated and called Dr. Duc.  Dr. Duc requested that plaintiff be sent to the U.C. Davis Medical Center emergency room.  According to medical records, plaintiff was admitted to the U.C. Davis emergency room at 9:38 p.m.  He was given Vicodin for pain and was told to wait to see an eye specialist.  At about 4:00 a.m. the following day, plaintiff saw Dr. Stuber who diagnosed plaintiff with a corneal abrasion, applied an eye patch, and provided him with eye drops.  At 7:00 a.m., plaintiff was discharged.  Dr. Stuber removed the eye patch, told plaintiff to follow up with the U.C. Davis Eye Center in two weeks, and that an ophthalmology exam of the cornea showed "[a]brasion resolved."  (Pl.'s Dep., CDCR Med. Records, U.C. Davis Med. Records.)

In June and July 2009, plaintiff claims that he temporarily lost vision in his left eye on three occasions.  Plaintiff was seen at California State Prison, Sacramento on June 13, 2009, June 14, 2009, June 17, 2009, and July 3, 2009.  He also had follow-up visits with U.C. Davis on June 30, 2009, July 3, 2009, July 14, 2009, August 7, 2009, and August 14, 2009.  At some point between June 11, 2009, and June 30, 2009, plaintiff was diagnosed with traumatic iritis.  On August 14, 2009, Dr. Krispel at U.C. Davis noted in his medical records that plaintiff's "traumatic iritis is resolved and his visual acuity is back to baseline."  (Pl.'s Dep., CDCR Med. Records.)

Plaintiff admits that he suffered headaches and migraines prior to being poked in the eye but claims that they now occur more consistently.  However, no doctor has ever indicated to plaintiff that the symptoms of iritis could have been prevented if he had been treated sooner on

1  June 10, 2009.  Nor has any doctor ever told plaintiff that the increasing frequency of his

2  headaches was caused by any delay in treating his eye.  (Pl.'s Dep., CDCR Med. Records.)

3  Given this evidence, or lack thereof, the burden shifts to plaintiff to establish the existence of a

4  genuine issue of material fact with respect to his deliberate indifference claim.

5         On defendant's motion for summary judgment, the court is required to believe

6  plaintiff's evidence and draw all reasonable inferences from the facts before the court in

7  plaintiff's favor.  Drawing all reasonable inferences in plaintiff's favor, the court finds that

8  plaintiff has not submitted sufficient evidence to create a genuine issue of material fact with

9  respect to his claim that defendant Bakewell responded to his serious medical need with

10 deliberate indifference.  See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

11        Plaintiff's primary complaint is that defendant Bakewell told Nurse Doe to

12 provide him with eye drops and send him back to his cell without examining his eye.  (Pl.'s Dep.

13 at 9-10.)  First, even assuming that defendant Bakewell was aware of plaintiff's medical needs as

14 he claims[1], defendant Bakewell treated plaintiff's medical condition by providing him with eye

15 drops.  Although plaintiff may not have been satisfied with the treatment he received, as a matter

16 of law, a mere difference of opinion between a prisoner and prison medical staff as to the proper

17 course of medical care does not give rise to a cognizable §1983 claim.  Jackson, 90 F.3d at 332;

18 Sanchez, 891 F.2d at 242; Franklin, 662 F.2d at 1344; see also Fleming v. Lefevere, 423 F. Supp.

19 2d 1064, 1070 (C.D. Cal. 2006) ("Plaintiff's own opinion as to the appropriate course of care

20 does not create a triable issue of fact because he has not shown that he has any medical training

21 or expertise upon which to base such an opinion.").  Here, plaintiff has provided no evidence to

22 show that the course of treatment the defendant Bakewell allegedly chose was medically

23 unacceptable under the circumstances or that defendant Bakewell chose the particular course of

24

25        [1]  The evidence reflects that defendant Bakewell does not recall plaintiff or anyone else
coming to the clinic on the day in question with such an injury and that plaintiff did not see
defendant Bakewell during his first visit to the clinic that day but has based his allegations
26 against her solely on the basis of his recognizing her voice.

14

1   treatment at issue in this action in conscious disregard of an excessive risk to plaintiff's health.

2   <u>Farmer</u>, 511 U.S. at 837.  Moreover, upon returning to the clinic a few hours later when his

3   condition had worsened, plaintiff was examined and promptly sent to an outside hospital to be

4   seen and treated by a specialist.

5           In addition, although the defendant did not examine plaintiff's eye, at most, this

6   would constitute neglect or medical malpractice but not deliberate indifference in violation of the

7   Eighth Amendment.  The Ninth Circuit has made clear that "[w]hile poor medical treatment will

8   at a certain point rise to the level of a constitutional violation, mere malpractice, or even gross

9   negligence does not suffice."  <u>Wood</u>, 900 F.2d at 1234.  <u>See</u> <u>also</u> <u>Hardy v. 3 Unknown Agents</u>,

10  690 F. Supp. 2d 1074, 1098 (C.D. Cal. 2010) (prison physician's prescribing of medication for

11  prisoner's psoriasis without actually examining prisoner's back did not amount to deliberate

12  indifference; "[w]hether or not this was sound medical practice, it was hardly a failing of

13  constitutional magnitude").  Moreover, this is not a case where plaintiff repeatedly sought help

14  from the defendant and was denied medical care as his condition worsened.  Here, it is

15  undisputed that plaintiff never saw defendant Bakewell or asked to speak with her.  The extent of

16  their interaction was him overhearing her give instructions to Nurse Doe to provide him with eye

17  drops and send him back to his cell.  Upon receiving the eye drops plaintiff voluntarily left the

18  medical clinic without asking any questions.  Plaintiff acknowledges that he did not ask to wait

19  to see a doctor or request pain medication before leaving the clinic.  (Pl.'s Dep. at 29-30 & 32.)

20  In this regard, defendant Bakewell's neglect, if any, was "an 'isolated occurrence' or an 'isolated

21  exception,'" which the Ninth Circuit has determined "militates against a finding of deliberate

22  indifference."  <u>McGuckin</u>, 974 F.2d at 1060.

23          Finally, plaintiff has provided no evidence to show that any delay in medical

24  treatment was intended to cause, and resulted in, the unnecessary and wanton infliction of pain,

25  significant harm, or permanent injury.  <u>See</u> <u>Berry</u>, 39 F.3d at 1057; <u>McGuckin</u>, 974 F.2d at 1059;

26  <u>Wood</u>, 900 F.2d at 1335; <u>Hunt</u>, 865 F.2d at 200; <u>Shapley</u>, 766 F.2d at 407.  As noted above,

1    plaintiff's medical records show that his corneal abrasion and traumatic iritis had resolved within

2    two months of him being poked in the eye.  (CDCR Med. Records at 110 & U.C. Davis Med.

3    Records at 145-46.)  Any speculation on plaintiff's part as to possible future harm he might

4    suffer or "potential predilection to permanent vision loss" is insufficient to create a genuine issue

5    of material fact.

6            Accordingly, the court concludes that defendant Bakewell is entitled to summary

7    judgment in her favor with respect to plaintiff's Eighth Amendment claim.[2]

8                                    **OTHER MATTERS**

9            Also pending before the court is plaintiff's motion for reconsideration of the

10   court's order striking his motion for summary judgment as untimely.  On April 27, 2011, plaintiff

11   filed his motion for summary judgment.  The court ordered the motion stricken as having been

12   untimely filed because the scheduling order in this case required the parties to file any pretrial

13   motions on or before January 3, 2011.

14           In his motion for reconsideration, plaintiff acknowledges that he had not

15   previously asked the court for leave to late-file a motion for summary judgment, but he requests

16   that the court reconsider its ruling on his dispositive motion because it purportedly helps prove

17   his position.  Plaintiff is advised that a party must show good cause to modify a scheduling order.

18   See Fed. R. Civ. P. 16(b); Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 607-08 (9th Cir.

19   1992).  Plaintiff has failed to do so in this case.  Moreover, he has been permitted to fully apprise

20   the court of his arguments on the relevant issues in opposing defendant's motion for summary

21   judgment.  Accordingly, the court will deny plaintiff's motion for reconsideration.

22   /////

23   /////

24   _____

25   [2]  The parties have also briefed the issue of whether defendant Bakewell is entitled to
     summary judgment in her favor based upon qualified immunity.  In light of the recommendation
     set forth above, however, the court will not reach the merits of those qualified immunity
26   arguments.

**CONCLUSION**

IT IS HEREBY ORDERED that plaintiff's motion for reconsideration (Doc. No. 40) is denied.

IT IS HEREBY RECOMMENDED that:

1. Defendant Bakewell's January 3, 2011 motion for summary judgment (Doc. No. 28) be granted; and

2. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 8, 2011.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
ammo0544.57

17